IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

HOLLIS STRICKLAND,

No. 3:16-cv-00965-MO

        Plaintiff,

OPINION AND ORDER

    v.

RM MECHANICAL, INC., an Idaho
corporation,

        Defendant.

MOSMAN, J.,

Plaintiff Hollis Strickland, a resident of Multnomah County, Oregon, brings two claims in his Complaint (#1) against Defendant, an Idaho corporation. In Claim One Plaintiff alleges Defendant discriminated against him as a result of his application for workers' compensation benefits in violation of Oregon Revised Statute § 659A.040. In Claim Two Plaintiff alleges Defendant discriminated against him on the basis of race in violation of Oregon Revised Statute § 659A.030(1)(b).

On April 14, 2017, Defendant RM Mechanical, Inc., moved for summary judgment on Claims One and Two of Plaintiff's Complaint. For the reasons stated below, the Court GRANTS in part and DENIES in part Defendant's Motion (#14) for Summary Judgment.

# BACKGROUND

Except as otherwise noted, the following facts are undisputed and taken from the record on summary judgment.[1]

Plaintiff was a union pipefitter. In June 2014 Plaintiff took an open call from his Local 290 union and went to work for Defendant, a subcontractor on a construction project in Hillsboro, Oregon. The Local 290 dispatched Plaintiff to RM to work as a pipefitter for Defendant at the journeyman rate of $41.21 per hour with additional benefits.

On July 2, 2014, Plaintiff injured his right index finger while working for Defendant. Mark Buehler, M.D., performed surgery on Plaintiff's finger the following day. Also on July 3, 2014, Plaintiff filed a workers' compensation claim. Defendant did not oppose Plaintiff's workers' compensation claim.

On July 9, 2014, Qian Leng, M.D., released Plaintiff to work on "modified activity" with the additional requirement that Plaintiff "have a shorter week day due to pain and the medications he is on, preferably for 3 hours a day." Def.'s Mot. (#14) Ex. C. Plaintiff returned to work three hours per day and performed office work in the trailer at the project site. Although Plaintiff only worked three hours per day after he returned to work, Defendant continued to pay Plaintiff at his journeyman rate for eight hours per day.

On August 6, 2014, Dr. Buehler filled out a work status report that limited Plaintiff to performing "office work" for the following two weeks. *Id.* Ex. C. Dr. Buehler's August 6 work

---

[1] In its Reply (#27) Defendant objects to the exhibits that Plaintiff attached to the Declaration (#24) of William J. Macke on the basis that Plaintiff fails to sufficiently authenticate those materials. Although the information of the face of the Macke Declaration is insufficient to authenticate the exhibits under Federal Rule of Evidence 901, it is obvious that those exhibits are a collection of emails among Defendant's employees, a video, and other materials that Plaintiff obtained in discovery, including many that were provided by Defendant. Accordingly, the Court OVERRULES Defendant's objection.

status report did not mention any limitation or any change to the preexisting limitation on the number of hours that Plaintiff could work.

Plaintiff's supervisors, however, grew concerned about Plaintiff's inability to work a full, eight-hour workday and to return to some work outside the trailer. On July 17, 2014, Bradley Hom, Defendant's chief financial officer, wrote in an email to Gary McManus (Defendant's project manager at the job site) and David Yates (another employee of Defendant), that: "I just called [Plaintiff's] doctor. He is out of the office until Monday. I want to talk to him about the 3-4 hour restriction. I want that removed. I'll do my best, some doctors work with us and some do not." Macke Decl. (#24) Ex. 3. On July 21, 2014, Hom wrote a follow-up email to Nancy Williams at AIG (Defendant's workers' compensation insurance carrier) with McManus and Yates copied in which Hom stated he spoke with Dr. Buehler, was dissatisfied with Dr. Buehler's assessment of Plaintiff's work-hours limitation, and indicated he did not believe Plaintiff's injury was sufficient to justify Plaintiff being limited to three hours of work per day. *Id.* Ex. 4.

On August 6, 2014, Plaintiff, who is African-American, posted a photograph to his Facebook account that depicted a noose fashioned from a yellow rope on a table inside the trailer at the job site. Plaintiff posted the photograph with the caption "In my office this morning, said they were practicing knots from there [*sic*] childhood." Def.'s Mot. (#14) Ex. P. McManus acknowledged making the noose "on an afternoon in early August 2014" after a particularly frustrating meeting, and explained that he made the noose as part of a joke about wanting to hang himself as a result of that meeting. McManus Decl. (#16) ¶ 14. McManus stated Ted Layton, Defendant's safety manager at the jobsite, instructed McManus to throw the noose in the garbage can outside the trailer, which McManus states he did. McManus further avers Plaintiff was not in

the trailer at the time he made the noose or when he disposed of it, and that there was not any racial motive behind making the noose. Nonetheless, McManus states on a day "shortly after" the day he created and threw away the noose, he saw it lying on one of the drafting tables in the trailer, but that he does not know how it got there. *Id.* ¶ 16. Plaintiff testified in his deposition that he saw the noose in the trailer on two other occasions, including once in McManus's office, but that he did not know when or by whom the noose was made. Riewald Decl. (#19) Ex. 1 at 38-43. McManus denies Plaintiff saw the noose in his office. McManus Decl. (#16) ¶ 17.

On August 7, 2014, Layton received the August 6, 2014, work status report from Dr. Buehler and sent it to McManus and Hom. McManus responded: "This looks to me to be what Hollis would have asked the doctor to write . . . His hurt finger cannot be as painful as he is playing it up to be." Macke Decl. (#24) Ex. 6. Hom responded:

> I agree. Unfortunately, the case manager is from the CCIP and not our own. Pain is very subjective. Last time I received a work status report I called Dr. Buehler and he essentially admitted to writing the restrictions to match whatever Hollis says he is capable of doing. We are in a tough spot. When the case manager is in town, I can force a move to another doctor.

*Id.* After further discussion regarding whether Plaintiff's injury necessitated the restrictions that Dr. Buehler had indicated, McManus wrote to Hom: "Sorry about wasting your time with dumb questions, I just have difficulty digesting crap, and there is so much of it over here, I have to vent to people I can trust once in a while . . . Again, sorry about all this." *Id.* Ex. 8. Hom replied:

> No worries, vent anytime – I get it. I vent to our workers comp agent and most case manager [*sic*] all the time. Some states are fair in my opinion. Other states, like Oregon and Washington, favor the employee too much in my opinion. I see why we are union and see the benefits. There are other difficulties with unions, including some short-sided [*sic*] selfish "me me" type union employees.

*Id.* Ex. 8.

On August 25, 2014, Dr. Buehler reiterated the limitation of Plaintiff to "desk-type work," but again did not mention any limitation concerning the number of hours per day that Plaintiff could work. The next day, after obtaining Dr. Buehler's updated work status report, Hom sent the following email to Nancy Williams at AIG:

> We have serious concerns regarding the legitimacy of the on-going [*sic*] worker's comp claim for Hollis Strickland. Please see attached his latest work status report. Mr. Strickland's finger appears to be healed. There is no bandage on the finger. Despite this he continues to insist on only working short days. The attached does not limit a number of hours as previous reports did. Therefore, we are assuming we can demand that Mr. Strickland work a full 8 hour day of light duty. Please confirm. If he does not work these hours, we will write him up as per our company policy for unexcused absenteeism and if needed and applicable terminate him for cause for violating Company policy.
>
> Please reply or call me today to discuss your Company's strategy to get Mr. Hollis back to full duty as a productive member of our team.

*Id.* Ex. 9, at 1. Tathay McNeilly, on behalf of AIG, responded:

> Based on the below it appear [*sic*] that you have full light duty hours available for Mr. Strickland. Based on this Mr. Strickland is required to work the light duty available as long as it continues to be within the restrictions given by the attending physician. If he does not work the light duty and decides to leave early then you are not required to pay him and we are not required to pay him TPD due to he chose not to work and the light duty was available.
>
> Based on the continued light duty (desk type work) indicated on the current work release I will have a letter sent to the attending physician to find out why he is unable to return to regular duty and when is he anticipated to be able to return to light duty. At this time he is seven and a half weeks from his surgery.

*Id.* Ex. 10. That evening McManus forwarded McNeilly's email to Layton and two of Defendant's other employees, and added:

> Hollis is ONLY paid for the hours he is here, nothing more . . . You can all see below what [*sic*] the claims manager is on-board with the fact that he is certainly (fraudulently) milking the system.
>
> Ted,

> He is your guy now. Because he is a recordable injury on this project, he will be assisting you in daily safety audits, he will review PTP's and contribute to them. He will also offer up some of his 30+ years in the business to our efforts in the field and provide SOME value to this project during his continued recovery. If he refuses, he will be written up for refusal to carry out the light duty activities of safety audits and PTP reviews. <u>He will be in the field</u>, he will NOT carry anything or be asked to do anything more than Safety Audits and PTP reviews . . . NOTHING that will require the use of his "finger."

*Id.* Ex. 10 (emphasis in original).

On September 3, 2014, Dr. Buehler completed a Release to Return to Work form that indicated Plaintiff could return to work full-time on similar modified duty. Def.'s Mot. (#14) Ex. F. The following day, Layton, on Defendant's letterhead, presented to Plaintiff a letter that stated:

> The purpose of this letter is to communicate certain facts regarding your worker's compensation claim. You reported your injury on 7/2/14. Since that date, we have accommodated the work restrictions placed on you by the assigned physician. You have actually only physically worked light duty on average 10-15 hours a week. We have paid you a full 40 hours.
>
> On August 25, 2014 the assigned physician indicated that you were released to work a full 40 hours per week. We communicated to you that we had 40 hours of light duty work available to you. Regardless, you decided to only work 15 hours. We only paid you 15 hours. We will only pay you are [*sic*] hours actually worked in the future as you are released to work 40 hours and we have 40 hours of light duty available to you.
>
> Please acknowledge you have received this letter and read it.

*Id.* Ex. G. Plaintiff did not sign the letter. *Id.* Layton and McManus each noted on the letter that Plaintiff refused to sign it when it was presented to him on the morning of September 5, 2014. That morning, McManus wrote to Hom:

> To add to this, (while it is still fresh in my mind) Hollis emphatically refused to sign the letter this morning. When I asked him if anything on the letter was false, he stated that we (Ted Layton and I) were trying to harass him and intimidate him. He did NOT indicate that anything in the letter was false. This being said the only voice that was raised in the conversation was Hollis'. He threatened us with the "Two Attorney's [*sic*] that he always keeps retained" and that he was "reporting

everything that has happened to Turner Construction, Intel and the local union hall" also that he had already spoken with Mark Sundstrom (Union Business Agent) and that we would be hearing from all of them today.

He is currently yelling at A.J. Holbrook right now, and I would expect a summary of that discussion from A.J. shortly.

Macke Decl. (#24) Ex. 12 at 2. Hom responded and instructed McManus that "[i]f he doesn't start working please give him a corrective action notice and if he refuses to sign please sign and have a witness sign." *Id.*

On September 8, 2014, McManus issued to Plaintiff a Corrective Action Notice in which McManus stated:

Employee has been released by his physician for light duty work.

RM Mechanical has made available Light duty work within the doctors [*sic*] limitations and subject employee refuses to work beyond sitting in our office trailer for three hours / day. Employee claims he cannot write, or do anything with his injured finger even after light duty release by attending physician.

As the light duty release claimed no time limitations on subject employee RM Mechanical has made 8 (eight) hours / day available for light duty work. Employee refuses to work.

Def.'s Mot. (#14) Ex. H. The Notice also indicated: "Continued refusal to work the light duty shift or carry out the activities outlined above and provided by RM Mechanical will result in termination for cause." *Id.* McManus signed the Notice together with Holbrook, but indicated that Plaintiff refused to sign the Notice when it was presented to him.

On the morning of Tuesday, September 9, 2014, Hom sent the following email to Williams at AIG:

I just left you a voicemail. Please call me. Hollis came into the trailer yesterday and told the managers that he was not feeling well and would not feel well until Thursday. At the same time, he is telling the union hall that he will have another doctor's note changing the latest work status report on Thursday. Mr. Strickland is acting in bad faith stating that he is sick and indicating that he will no longer be sick on Thursday. We would like to terminate him for cause for absenteeism and

> not working a full work day while on probation from the last corrective action notice we emailed to you. Please reply to this email indicating that AIG supports this action and will not pay loss time to Mr. Strickland after he is terminated.

Macke Decl. (#24) Ex. 14 at 2. Williams responded that AIG would not be responsible to pay Plaintiff time loss because he would be fired for cause, but if Dr. Buehler provided a new work status report that Defendant would first be required to provide Plaintiff with a new offer letter detailing the conditions of employment in light of Dr. Buehler's recommendations. *Id.* Ex. 14, at 1.

That evening McManus emailed Hom and asked: "So, are we terminating Hollis? Or waiting for the much anticipated '*new work slip with restriction changes*'?" *Id.* (emphasis in original). Hom responded that McManus should wait until the following day, but stated if Plaintiff did not work the full day on the following day that Defendant would terminate Plaintiff's employment for cause. *Id.*

The next day, on September 10, 2014, Dr. Buehler issued another work status report in which he indicated Plaintiff could perform light work, but that he "may <u>not</u> do field work" and may work an eight-hour day as long as he is able to attend physical therapy sessions. Def.'s Mot. (#14) Ex. I (emphasis in original).

The following day McManus sent the following email to Hom:

> Attached is the doctor's re-assignment of what Hollis is released for as far [as] work limitations.
>
> I believe our light duty assignments are still in line with "desk work" (That he refuses to do or does such a terrible job that we spend 3 times the energy fixing what he does) the only difference in "desk work" and the light duty work we have for him is that he will be walking around the project instead of sitting at our conference table texting. Walking around doing safety audits will have ZERO impact on his finger. I will personally get him a pair of 3 or 4XL gloves so there is no issue with him wearing the hand protection required for field walks.

Macke Decl. (#24) Ex. 15, at 1-2 (emphasis in original). After Hom and Williams further discussed the possibility of paying Plaintiff at a lower wage and whether AIG would be required to compensate Plaintiff for time loss if they did so, McManus emailed:

> Hollis has already made it clear that "*anything but a desk job in the office is outside of the doctor's restrictions.*" He will refuse any offer that includes job-site walks, even if walking the job-site is all that we require of him. The building is in the finishing stages, clean-rooms and clean labs. Areas, however[,] he believes that walking the project puts him at risk.

*Id.* Ex. 15, at 3 (emphasis in original).

Hom also emailed Williams to request that she contact Dr. Buehler to clarify where on the job site Plaintiff would be capable of working, and, in particular, whether Plaintiff could work in the field. *Id.* Ex. 18. Williams sent to Dr. Buehler a letter asking Dr. Buehler to "explain why the claimant cannot walk the job site that is on solid ground at this time inside the buildings and a bit outside to go from building to building for a [right] finger injury." Def.'s Mot. (#14) Ex. J, at 3. Dr. Buehler wrote at the bottom of the letter sent to him by Williams at AIG that Plaintiff "may walk job site on solid ground." *Id.* Dr. Buehler signed the response with an illegible marking that does not clearly reflect his name or any portion thereof.

On the morning of September 24, 2014, Anthony Holbrook emailed McManus and stated he (together with another employee of Defendant) presented Dr. Buehler's note to Plaintiff, but that Plaintiff did not believe the note was from Dr. Buehler and refused to expand his job duties to walking the job site even on solid ground. Macke Decl. (#24) Ex. 20, at 1. Shortly thereafter, Hom emailed Williams and McNeilly at AIG and stated Plaintiff was "refusing to walk the site on solid ground" and informed them that Defendant planned to issue a corrective action notice to Plaintiff and, if Plaintiff persisted, to terminate his employment for cause. *Id.* Ex. 20, at 3. Later that afternoon McManus forwarded Holbrook's email to Hom and stated: "So, by my

interpretation, this is a refusal to work correct? Corrective action notice is locked and loaded. I will present it to him with your concurrence." *Id.* Ex. 20, at 1. After Williams responded to Hom's email by inquiring whether Defendant's employees had presented Dr. Buehler's clarification to Plaintiff (*see id.* Ex. 20, at 3), McManus sent the following email to Williams, Hom, and Holbrook:

> We did indeed present the paperwork sent to us yesterday to Hollis this morning.
>
> His response was: "*That is from AIG NOT my doctor, I do NOT do ANYTHING AIG tells me to do, I only do what my doctor tells me to do . . . Claims people don't tell me what to do*" . . . His adamant refusal to acknowledge that the doctor's handwriting on the fax document was actually his doctor's handwriting is my concern. He also claims that he is not going to recognize anything concerning his work status unless it comes directly from his doctor, and has no intention of seeing his doctor again until October 8th.
>
> He does report to work each day (wearing slippers) and has made his intentions clear, that he will NOT go out on the job-site because of his finger.
>
> I will draft up a letter of the light duty work (in the field) that we have available to him, 8 hours / day / 40 hours / week; and forward this to the distribution list of this thread for review before we present it to him. Please stand by for the activity description for your review.

*Id.* Ex. 21 (emphasis in original).

Yates wrote a letter to Plaintiff dated September 25, 2014, in which he stated:

> The attached Addendum to your work status has been forwarded to you via hand delivery. To confirm this work status please contact Dr. Buehler's office: 1-503-239-8430. In addition, this work status form is being mailed to your home address today via Dr. Buehler.
>
> Aware of the full extent of your Dr. Buehler work release, please review our work offer which is in compliance with your Doctors orders. This will be the second and final offer today.

Def.'s Mot. (#14) Ex. K, at 1. That same morning, McManus signed and delivered the work offer to Plaintiff that offered him a full-time position at the same compensation performing "light duty" within the restrictions identified by Dr. Buehler. *Id.* Ex. K, at 2. After presenting the letter

to Plaintiff, McManus told Plaintiff that "I need to inform you if you don't sign this, you're quitting." Macke Decl. (#24) Ex. 25, at 03:20. Plaintiff, however, insisted he had not been provided any work release from Dr. Buehler and disputed the authenticity of the note from Dr. Buehler presented to him the day before. After some additional conversation, McManus again explained to Plaintiff that if he refused to sign the letter that Defendant would deem Plaintiff to be quitting. Plaintiff, however, responded: "Do whatever you want. I ain't quitting. That's what you say." *Id.* Ex. 25, at 04:12. After McManus again explained Defendant's position, Plaintiff again insisted he was not quitting.

After that exchange, McManus sent the following email to Williams, Hom, Holbrook, and Yates:

> Attached is the proposal letter that was just presented to Mr. Strickland.
>
> The presentation of the letter was digitally videoed.
>
> Mr. Strickland refused to sign the job offer letter, stating that he was NOT going into the field because he did not receive a release to work in the field directly from his doctor. We offered him another copy of the doctor's limited release and refused to accept that as he already has a copy, however continued to refuse to acknowledge any such release . . . He was informed that his refusal was considered a quit, and he responded with "*whatever*," but remains sitting at our conference room table.
>
> I also asked Hollis if he had an email address so I could have the attending physician send a copy of the release directly to Mr. Strickland, so he would have the limited release to work direct from the physician . . . He replied with "*No, I don't have an email address*." I questioned him again, to be certain he understood, and he replied with "*I do not have an email address*."
>
> Mr. Strickland refuses to leave the project office, even though he has been advised that the refusal to work the position offered that is compliant with the limited work release by the attending physician was [ ] considered a quit.
>
> Please advise as to how I should proceed.

*Id.* Ex. 23. McManus signed a Termination Notice on September 25, 2014, that reflected a "voluntary quit" as the reason for discharge. *Id.* Ex. 26.

Two days later, McManus forwarded to Holbrook an email that he sent to Mark Sundstrom with the Local 290 union hall regarding various documents that Defendant provided to Plaintiff throughout the month of September. McManus commented to Holnbrook "It isn't going to end with this leach [*sic*] on society." *Id.* Ex. 24, at 1.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden for a motion for summary judgment is on the moving party to identify the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is satisfied, the burden shifts to the non-moving party to demonstrate, through the production of evidence listed in Fed. R. Civ. P. 56(c)(1), that there remains a "genuine issue for trial." *Celotex*, 477 U.S. at 324. The non-moving party may not rely upon the pleading allegations, *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995) (citing Fed. R. Civ. P 56(e)), or "unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn from the facts are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

As noted, Defendant moves for summary judgment on both Claim One and Claim Two in Plaintiff's Complaint. In particular, Defendant moves for summary judgment on Claim One in its entirety and, in the alternative, for partial summary judgment as to the extent of damages

Plaintiff can recover in Claim One. Defendant moves for summary judgment on Claim Two in its entirety.

The parties agree this case is properly before this Court on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Accordingly, the Court applies the substantive law of the State of Oregon and federal rules of procedure. *Hyan v. Hummer*, 825 F.3d 1043, 1046 (9th Cir. 2016); s*ee also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## I.   Claim One – Workers' Compensation Discrimination

Oregon Revised Statute § 659A.040 provides:

> It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws.

In order to establish a *prima facie* case for a violation of § 659A.040, Plaintiff must prove the following elements: (1) Plaintiff invoked the workers' compensation system, (2) Defendant discriminated or retaliated against Plaintiff in hiring or the tenure, terms, or conditions of Plaintiff's employment, and (3) Defendant discriminated or retaliated against Plaintiff because he invoked the workers' compensation system. *Davis v. Tri-County Metro. Transp. Dist. of Oregon*, 45 F. Supp. 3d 1222, 1238 (D. Or. 2014); s*ee also Williams v. Freightliner, LLC*, 100 P.3d 1117, 1121 (Or. Ct. App. 2004).

The parties agree Plaintiff has satisfied the first element; it is undisputed that Plaintiff filed a workers' compensation claim. The parties nonetheless disagree as to whether Plaintiff can satisfy the second and third elements of his *prima facie* case on summary judgment.

**A. Act of Discrimination or Retaliation**

Defendant contends it is entitled to summary judgment because Plaintiff has failed to demonstrate Defendant took any actionable discriminatory or retaliatory action.

In order to constitute an act of discrimination or retaliation actionable under § 659A.040 the allegedly discriminatory or retaliatory action must, by its nature, be an employment action "'with respect to hire or tenure or any term or condition of employment.'" *Davis*, 45 F. Supp. 3d at 1240 (quoting Or. Rev. Stat. § 659A.040). Moreover, Plaintiff must also show that a "reasonable employee would have found the challenged action . . . materially adverse"; that is, the challenged action "might have dissuaded a reasonable worker from applying for benefits or invoking the procedures provided for in ORS chapter 656." *Alvarez v. Ecoloab, Inc.*, Civ. No. 6:13-cv-01718-MC, 2014 WL 6684910, at *5 (D. Or. Nov. 25, 2014).

At the outset the Court notes Plaintiff is far from clear in identifying which specific action(s) he contends constitute the act(s) of discrimination or retaliation. Construing the record in the light most favorable to Plaintiff, the Court initially identifies the following actions as those that could potentially qualify as actionable discriminatory or retaliatory actions under § 659A.040: (1) Plaintiff's discharge from employment with Defendant; (2) Defendant's insistence that Plaintiff work eight hours per day beginning August 25, 2014, and determination that it would cease paying Plaintiff for time that he did not work; and (3) Defendant's insistence beginning September 24, 2014, that Plaintiff expand his work duties to include light work in the field and outside the trailer office. The Court notes other actions to which Plaintiff refers (including the alleged making and display of the noose and the allegedly hostile behavior of Defendant's employees toward Plaintiff) are not employment actions "with respect to hire or

tenure or any term or condition of employment," and, therefore, cannot constitute actionable discrimination or retaliation under § 659A.040.

Defendant's insistence that Plaintiff both work an eight-hour day after August 25, 2014, and work in the field beginning September 24, 2014, however, were in their nature part of the same course of events that led to the end of Plaintiff's employment with Defendant. Absent any clear articulation of Plaintiff's § 659A.040 claim to the contrary, the Court considers all of these actions together with Plaintiff's discharge as a single act of discrimination or retaliation.

Defendant, nonetheless, contends Plaintiff voluntarily quit and, therefore, was not terminated by Defendant. Under Oregon law, a discharge can be either actual or constructive. An actual discharge takes place when an employer formally fires an employee. *McGanty v. Staudenraus*, 901 P.2d 841, 853 (Or. 1995). A constructive discharge takes place when the employer (1) "intentionally created or intentionally maintained specified working condition(s)"; (2) that were "so intolerable that a reasonable person in the employee's position would have resigned because of them"; (3) "the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions"; and (4) "the employee did leave the employment as a result of those working conditions." *Id.* at 856-57.

The record on summary judgment, however, is clear that Plaintiff did not voluntarily quit. Defendant points to the similar Declarations of McManus and Hom to argue it is undisputed that Defendant did not actually discharge Plaintiff. McManus and Hom state:

> RMI did not make a decision to discharge Mr. Strickland from his employment. Instead, RMI merely told Mr. Strickland on September 25, 2014, that he would be deemed to have abandoned and quit his job if he refused to do the light duty work out in the field that complied with his doctor's light duty restrictions. He nevertheless refused.

McManus Decl. (#16) ¶ 11; Hom Decl. (#15) ¶ 16 (same). The statements of McManus and Hom (together with McManus's indication that Plaintiff "voluntarily quit" on the Termination Notice) are plainly contradictory to Plaintiff's repeated, recorded statements that he was not quitting. In fact, consistent with Plaintiff's repeated statements that he was not voluntarily quitting his job, McManus's email to Williams immediately after the September 25, 2014, meeting with Plaintiff makes clear that Plaintiff remained on the job site after the meeting apparently over Defendant's objection. Macke Decl. (#24) Ex. 23 ("Mr. Strickland refuses to leave the project office, even though he has been advised that the refusal to work the position offered that is compliant with the limited work release by the attending physician was considered a quit."). Defendant neither provides any legal authority for the proposition that an employer may "deem" an employee to have involuntarily quit his employment in these circumstances despite clear statements to the contrary, nor points to any other evidence in the record that indicates Plaintiff voluntarily quit his job with Defendant.

Accordingly, on this record the Court concludes Defendant actually discharged Plaintiff. Termination clearly qualifies as an employment action "with respect to hire or tenure or any term or condition of employment" that, if taken in retaliation for filing a workers' compensation claim, would be actionable under § 659A.040. At this stage of the proceedings, therefore, Plaintiff has met his burden of satisfying the second element of a claim under § 659A.040.

## B. Causation

Plaintiff, nonetheless, must still demonstrate Defendant took the adverse action because Plaintiff availed himself of the workers' compensation system.

This Court applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in determining whether Plaintiff has carried his burden with regard

to the causation element at this stage of the proceedings. *See Anderson v. Hibu, Inc,*, 26 F. Supp. 3d 1019, 1025 (D. Or. 2014). Although Oregon courts have rejected the use of the *McDonnell Douglas* analysis when claims under § 659A.040 are brought in state court, *see Williams*, 100 P.3d at 112, the Ninth Circuit has held the *McDonnell Douglas* analysis applies in federal court as a matter of federal procedural law notwithstanding a state-law rule to the contrary. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-93 (9th Cir. 2001).

The first portion of the *McDonnell Douglas* analysis, however, is the analysis under state law. To satisfy his initial burden on the third element Plaintiff must make a *prima facie* showing that his "invocation of the workers' compensation system was a substantial factor" in Defendant's decision to undertake the adverse employment action.  *Herbert v. Altimeter, Inc.*, 218 P.3d 542, 548 (Or. Ct. App. 2009).  "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference'" in the adverse employment action. *Estes v. Lewis and Clark Coll.*, 954 P.2d 792, 797 (Or. Ct. App. 1998) (quoting *Nelson v. Emerald People's Util. Dist.*, 840 P.2d 1384, 1390 (Or. Ct. App. 1992)); s*ee also Davis*, 45 F. Supp. 3d at 1241. "The degree of proof necessary to establish a *prima facie* case of a causal link on summary judgment is 'minimal' and a plaintiff need only prove an inference of discrimination." *Davis*, 45 F. Supp. 3d at 1241.

Under the *McDonnell Douglas* framework, however, "after a plaintiff proves a *prima facie* case of retaliation, the employer must present evidence of a legitimate, non-retaliatory reason for the adverse action." *Id.* at 1238. "If defendant meets this burden, then the burden returns to plaintiff to show by a preponderance of the evidence that the alleged legitimate, nondiscriminatory reason for the adverse employment action is merely a pretext for discrimination." *Anderson*, 26 F. Supp. 3d at 1025; s*ee also Davis*, 45 F. Supp. 3d at 1238.

Plaintiff contends Defendant's discriminatory intent can be inferred from (1) Defendant's email communications in which its employees criticized Plaintiff, his recovery from his finger injury, his physician, and the workers' compensation system in Oregon; (2) Defendant's alleged refusal to provide Plaintiff with additional time to verify the authenticity of the note from Dr. Buehler that was presented to him on September 24, 2014; and (3) Defendant's hostility toward Plaintiff. Defendant, on the other hand, contends Plaintiff's discharge was a result of his refusal to perform his job requirements within the restrictions set out by Dr. Buehler, and not because Plaintiff availed himself of the workers' compensation system.

The record on summary judgment is replete with evidence that Plaintiff and Defendant became involved in a protracted dispute regarding the job duties that Plaintiff could perform while he recovered from his finger injury. It is clear from the record that Plaintiff and Defendant disagreed profoundly as to the work activities that Plaintiff could perform, and it is apparent that a series of ambiguous statements from Plaintiff's physician contributed to that disagreement.

That dispute, however, is quite different from discrimination or retaliation as a result of Plaintiff filing a workers' compensation claim. There is little evidence in the record that Defendant changed the conditions of Plaintiff's employment and ultimately terminated Plaintiff based on his filing of a workers' compensation claim. Although the emails between Defendants' employees and AIG reveal considerable frustration and, indeed, some degree of hostility toward Plaintiff, that frustration and hostility was exclusively tied to the dispute regarding Plaintiff's workplace limitations and his related interpersonal conflict with McManus and others.

The evidence in the record that best supports an inference that Defendant discriminated or retaliated against Plaintiff on the basis of Plaintiff's invocation of the workers' compensation system is Hom's August 7, 2014, email in which he opined the workers' compensation system in

some states like Oregon and Washington "favor the employee too much." Macke Decl. (#24) Ex. 8. Hom's generalized opinion regarding the workers' compensation system, however, is a far cry from any indication that Hom or any of Defendant's other employees retaliated against Plaintiff for invoking that system. The remainder of the emails focus overwhelmingly on the legitimacy of Plaintiff's ongoing workplace limitations and how Defendant should accommodate Plaintiff's injury.

Moreover, Plaintiff's contention that Defendant refused to provide him sufficient time to contact Dr. Buehler to verify the authenticity of the work release note is not supported by evidence.[2] There is not any evidence in the record from which a rational trier of fact could conclude Defendant denied Plaintiff a reasonable opportunity to contact Dr. Buehler. Although there is some equivocal evidence that suggests Plaintiff may have attempted unsuccessfully to contact Dr. Buehler sometime between when the note was provided to him on September 24, 2014, and the meeting on the morning of September 25, 2014, at the meeting on September 25 Plaintiff was adamant that he would not speak with Dr. Buehler to verify the authenticity of the note until his next appointment almost two weeks later, on October 8, 2014. There is not any evidence in the record that Plaintiff requested any additional time to contact Dr. Buehler's office or to hear back regarding any previous inquiry into Dr. Buehler's office before signing the work offer. Accordingly, Plaintiff's contention that Defendant's alleged refusal to provide Plaintiff with additional time to consult with Dr. Buehler is without merit.

The record, therefore, is undisputed and overwhelming that Defendant terminated Plaintiff's employment as a result of a dispute between Plaintiff and Defendant regarding the work duties that Plaintiff was medically cleared to perform and Plaintiff's resulting refusal to

---

[2] It is now undisputed that the note from Dr. Buehler was authentic.

comply with the job requirements imposed by Defendant. Plaintiff provides no legal authority –

and this Court cannot locate any – to support the proposition that adverse action as a result of

such a dispute between and employee and employer is actionable under § 659A.040.

Accordingly, the Court concludes Plaintiff has failed to make even the initial *prima facie*

showing that his "invocation of the workers' compensation system was a substantial factor" in

Defendant's decision to terminate Plaintiff's employment. *See Herbert*, 218 P.3d at 548.

Even if Plaintiff had made the initial *prima facie* showing, for the same reasons explained

above the Court would conclude Defendant has carried its burden of demonstrating it had "a

legitimate, non-retaliatory reason for the adverse action." *See Davis*, 45 F. Supp. 3d at 1238. The

Court would also find Plaintiff, in turn, has failed to demonstrate that non-retaliatory reason

(*i.e.*, the dispute regarding Plaintiff's limitations and Plaintiff's refusal to perform his job duties

as required by Defendant) for his employment termination was pretextual.

For these reasons the Court concludes Defendant is entitled to summary judgment on

Claim One. Because the Court grants summary judgment to Defendant on Claim One, the Court

need not address Defendant's alternative argument regarding the extent of recoverable damages

on Claim One.

## II.      Claim Two – Racial Discrimination

In Claim Two of his Complaint, Plaintiff alleges Defendant engaged in racial

discrimination against him in violation of Oregon Revised Statute § 659A.030.

Section 659A.030 was "modeled" after Title VII of the federal Civil Rights Act. *Pool v.

VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002). Accordingly, courts – including Oregon state

courts – give effect to federal law when resolving claims brought under § 659A.030. *See

Campbell v. Knife River Corp. – Nw.*, 783 F. Supp. 2d 1137, 1147 (D. Or. 2011) (collecting

cases). Like Title VII, a claim under § 659A.030 has "three components: disparate treatment, hostile environment, and retaliation." *Id.*

In his Complaint Plaintiff raised a § 659A.030 claim on two theories: (1) a hostile environment theory regarding the placement of the noose in his work area; and (2) a disparate treatment on the basis of race theory in relation to the handling of his workers' compensation claim. In his Response to Defendant's Motion for Summary Judgment, however, Plaintiff only advances his hostile environment theory regarding the noose he observed in his work area. *See* Pl.'s Resp. (#22) at 11-12. After a review of the record on summary judgment, the Court concludes there is not any evidence from which a rational trier of fact could find disparate treatment on the basis of race in relation to Defendant's handling of Plaintiff's workers' compensation claim. Accordingly, the Court will only address Plaintiff's hostile work environment theory regarding the noose.

In order to survive summary judgment on his hostile work environment claim, Plaintiff "must raise a triable issue of fact as to whether (1) the defendant[] subjected [him] to verbal or physical conduct based on [his] race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). In determining whether the conduct at issue was sufficiently severe or pervasive to violate § 659A.030 the Court looks at "'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). "In addition, '[t]he working

environment must both subjectively and objectively be perceived as abusive.'" *Vasquez*, 349 F.3d at 642 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)).

Defendant contends it is entitled to summary judgment because the conduct regarding the noose does not meet the third element; *i.e.*, the display of the noose was not "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Surrell*, 518 F.3d at 1108. Defendant contends there is not any evidence regarding where the noose came from, how it appeared on the drafting table near Plaintiff's work station, or whether it was placed there to send any message to Plaintiff. In particular, Defendant contends this case is controlled by *Henry v. Regents of Univ. of Cal.*, 644 F. App'x 787, 788-89 (9th Cir. 2016). In *Henry*, the Ninth Circuit affirmed the district court's grant of summary judgment to the defendant employer on a Title VII hostile work environment claim because the plaintiff's claim, which alleged he observed a noose hanging at his workplace, did not establish the conduct was sufficiently severe or pervasive. *Id.* In so finding, the Ninth Circuit noted that "'isolated incidents (unless extremely serious)' are not severe or pervasive enough to alter the conditions of employment," and that "Henry has not provided any evidence, other than his own conclusory allegations, that shows any racial motive behind the noose incident or that the noose was directed at him personally." *Id.* (quoting *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003)).

The outcome in *Henry*, however, was driven by the fact that the plaintiff's observation of the noose was an isolated incident. Although it is undisputed that Plaintiff observed the noose in the trailer on one occasion, Plaintiff testified in his deposition that he observed it on two more occasions, including once in McManus's office. *See* Riewald Decl. (#19) Ex. 1 at 38-43. Although McManus and others contradict Plaintiff's deposition testimony, determining whose testimony regarding the noose is credible is a matter reserved for the trier of fact. Accordingly

this case is distinguishable from *Henry* because the Court cannot conclude on summary judgment that the display of the noose was an isolated incident.

Applying the factors set out in *Vazquez* for determining whether conduct rises to the sufficient level of severity and pervasiveness, the Court concludes a rational trier of fact could find Plaintiff has established a claim for hostile work environment. First, as noted, a genuine issue of material fact exists as to whether Plaintiff observed the noose on one occasion or on three occasions. Because at this stage of the proceedings the Court is required to draw all rational inferences in favor of the nonmoving party, this factor supports a finding that the conduct was sufficiently severe and pervasive.

Second, the Court finds a rational trier of fact could find the display of the noose to be a severe instance of racial abuse. Displayed to an African-American individual, a noose can be interpreted as a powerful image that evokes lynching. It is undisputed that McManus made the noose. It is also indisputable from the record as a whole that McManus bore some animus (whether appropriate or inappropriate) toward Plaintiff. Moreover, it is undisputed that McManus was a primary participant in the protracted conflict that Defendant had with Plaintiff over the job duties that Plaintiff could perform while recovering from his finger injury. A rational trier of fact, therefore, could infer that McManus created and displayed the noose in an effort to threaten or to harass Plaintiff.[3] In light of its historical significance, a supervisor using a noose to threaten or to harass an African-American subordinate employee with whom he has a longstanding conflict about the terms of the employee's job would be quite severe. Because at this stage of the proceedings the Court is required to draw all reasonable inferences in favor of

---

[3] Although Defendant frames its argument under the third element of Plaintiff's § 659A.030 claim, the Court notes this finding would also preclude summary judgment for Defendant under the first two elements; *i.e.*, Plaintiff has created a genuine issue of material fact as to whether Defendant subjected Plaintiff to unwelcome verbal or physical conduct based on his race.

the nonmoving party, the second factor, therefore, strongly supports Plaintiff's § 659A.030 claim.

Third, the display of a noose to an African-American individual goes well beyond being a mere offensive utterance and carries with it an implied threat of violence. As noted, a noose in that context can be viewed as evocative of lynching. The third factor, therefore, also supports a finding that the conduct was sufficiently severe and pervasive.

Finally, as to the fourth factor, there is little evidence in the record regarding the impact that observing the noose had on Plaintiff's job performance. A trier of fact could rationally infer from Plaintiff's Facebook post that he was upset by the presence of the noose near his work station. Nonetheless, because there is little evidence in the record regarding the effect the observation of the noose had on Plaintiff's work performance, this factor is the least supportive of Plaintiff's claim.

On balance, however, the Court concludes Plaintiff has carried his burden on summary judgment of demonstrating that the alleged conduct was sufficiently severe and pervasive to support a claim under § 659A.030. Plaintiff, therefore, has satisfied the elements of a claim under § 659A.030 at this stage of the proceedings. Accordingly, the Court finds Defendant is not entitled to summary judgment on Claim Two.

## CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendant's Motion (#14) for Summary Judgment. The Court GRANTS Defendant's Motion as to Claim One in Plaintiff's Complaint (#1). The Court DENIES Defendant's Motion as to Claim Two.

IT IS SO ORDERED.

DATED this ___30th___ day of August, 2017.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
Chief United States District Judge